UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


STEPHEN C. GRANT,

        Petitioner,

                              CASE NO. 2:11-CV-12771
   v.                          JUDGE DAVID M. LAWSON
                              MAGISTRATE JUDGE PAUL J. KOMIVES

KENNETH T. McKEE,

        Respondent.

_____/


## REPORT AND RECOMMENDATION

*Table of Contents*

| | | |
|---|---|---|
| I. | RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| II. | REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| | A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| | B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . | 3 |
| | C.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 |
| | D.    *Pretrial Publicity (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7 |
| |        1.   *Background Relating to This Claim* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7 |
| |        2.   *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8 |
| |        3.   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 |
| | E.    *Petitioner's Statement (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15 |
| |        1.   *Background Relating to this Claim* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16 |
| |        2.   *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17 |
| |        3.   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19 |
| | F.    *Recommendation Regarding Certificate of Appealability* . . . . . . . . . . . . . . . . . . . . . . | 26 |
| |        1.   *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26 |
| |        2.   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 27 |
| | G.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28 |
| III. | NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28 |

\*      \*      \*      \*      \*

I.    <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus and should deny petitioner a certificate of appealability.

II.    <u>REPORT</u>:

A.    *Procedural History*

1.     Petitioner Stephen C. Grant is a state prisoner, currently confined at the Bellamy Creek Correctional Facility in Ionia, Michigan.

2.     On December 21, 2007, petitioner was convicted of second degree murder, MICH. COMP. LAWS § 750.317, following a jury trial in the Macomb County Circuit Court.  Petitioner was also convicted, pursuant to a guilty plea, of mutilation of a dead body, MICH. COMP. LAWS § 750.160.  On February 21, 2008, he was sentenced to a term of 50-80 years' imprisonment on the murder conviction and to a concurrent term of 6-10 years' imprisonment on the mutilation of a dead body conviction.

3.     Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.     THE TRIAL COURT REVERSIBLY ERRED IN DENYING THE DEFENSE REQUEST FOR A CHANGE OF VENUE, WHERE NEARLY HALF OF THE NEARLY FOUR HUNDRED POTENTIAL JURORS QUESTION[ED] DURING THE VOIR DIRE WERE EXCUSED FOR CAUSE FOR CONCLUDING THAT MR. GRANT WAS GUILTY OR COULD NOT AFFORD HIM HIS CONSTITUTIONAL RIGHT TO THE PRESUMPTION OF INNOCENCE.

II.     THE TRIAL COURT REVERSIBLY ERRED IN DENYING THE DEFENSE MOTION TO SUPPRESS MR. GRANT'S CUSTODIAL STATEMENT TO THE POLICE, AS THE POLICE VIOLATED AN AGREEMENT WITH MR. GRANT THAT THEY WOULD CONTACT HIS ATTORNEY AS SOON AS HE WAS TAKEN INTO CUSTODY, AND THAT THEY WOULD NOT SEEK TO QUESTION HIM UPON HIS ARREST, AND THUS THE PURPORTED WAIVER OF HIS CONSTITUTIONAL RIGHT TO COUNSEL AT THE CUSTODIAL INTERROGATION WAS INVALID.

III.     THE MATTER SHOULD BE REMANDED TO THE TRIAL COURT FOR A RESENTENCING AS THE TRIAL JUDGE FAILED TO ARTICULATE A SUBSTANTIAL AND COMPELLING RATIONALE FOR THE EXTENT OF THE UPWARD DEPARTURE OF THE MINIMUM SENTENCE FROM THE SENTENCING GUIDELINES RANGE.

2

IV.   WHERE THE TRIAL JUDGE FAILED TO TAKE INTO ACCOUNT MR. GRANT'S ABILITY TO REPAY THE COSTS OF HIS APPOINTED TRIAL COUNSEL, THE MATTER SHOULD BE REMANDED TO THE TRIAL COURT FOR CONSIDERATION OF HIS PRESENT AND FUTURE ABILITY TO PAY.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Grant*, No. 284100, 2009 WL 3199493 (Mich. Ct. App. Oct. 6, 2009) (per curiam).

4.     Petitioner sought leave to appeal these issues to the Michigan Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See People v. Grant*, 485 Mich. 1128, 779 N.W.2d 803 (2010).

5.     Petitioner, through counsel, filed the instant application for a writ of habeas corpus on June 27, 2011.  As grounds for the writ of habeas corpus, he raises the change of venue and confession claims that he raised in the state courts.

6.     Respondent filed his answer on January 9, 2012.  He contends that petitioner's claims are without merit.

B.     *Factual Background Underlying Petitioner's Conviction*

Petitioner's conviction arises from the murder of his wife, Tara Grant.  As petitioner indicates in his brief in support of the petition, "[t]he defense at trial did not dispute that [petitioner] was criminally responsible for his wife's death, but argued that the killing was either committed on the spur-of-the-moment during an emotional argument, absent any premeditation or deliberation, or was provoked by Mrs. Grant's actions."  Memorandum of Law in Supp. of Pet., at 1.  The evidence adduced at trial was accurately summarized by the Michigan Court of Appeals:

Defendant and Tara were involved in an argument in early February 2007 at their Macomb County home. Apparently, the couple's argument escalated to the point where it became physical and defendant strangled Tara causing her death. Defendant then took her body to his place of employment and dismembered her. Defendant

3

scattered Tara's body parts throughout a public park near the couple's home, and hid her torso in a large plastic container in the family's garage. Defendant reported Tara missing several days later.

Several weeks later, police executed search warrants at defendant's home and business, and discovered a portion of Tara's body in the couple's garage. By then, defendant had fled the area in a borrowed vehicle. A search conducted by various law enforcement agencies resulted in the apprehension of defendant at a remote park in northern Michigan. At the time of his arrest, defendant had been wandering through the park for several hours and suffered from mild frostbite and hypothermia. Defendant was immediately transported to a local hospital where he fully recovered within two days. During his stay in the hospital, defendant confessed the details of the crime to police.

*Grant*, 2009 WL 3199493, at *1.[1]

C.      *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

---

[1]For a more thorough summary of the evidence at trial, see Pet'r's Memorandum in Supp. of Pet., at 17-24.

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409. As the Supreme Court has explained, the standard for relief under § 2254(d) "is difficult to meet, [and] that is because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). As the Court explained, "[s]ection 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice system,' not a substitute for ordinary error correction through appeal." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in the judgment)). Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility

5

for fairminded disagreement." *Id*. at 786-87.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412). The relevant "clearly established law" is the law that existed at the time of the last state court decision to issue a reasoned decision on the claim, *see Greene v. Fisher*, 132 S. Ct. 38, 44-45 (2011), and in evaluating the reasonableness of that decision a federal habeas court is limited to the record that was before the state court at the time of its decision, *see Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v.*

6

*Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.    *Pretrial Publicity (Claim I)*

Petitioner first contends that he was denied a fair trial by the trial court's refusal to change venue in light of prejudicial pretrial publicity.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.    *Background Relating to This Claim*

The nature of the pretrial publicity surrounding petitioner's trial and the trial court's efforts to seat an unbiased jury are accurately described by the Michigan Court of Appeals:

> [T]his case, as claimed by defendant, received an unprecedented amount of pretrial publicity. There were in excess of fifty written news articles concerning the crime published between February 2007 and the December 2007 trial, with a large number of the articles appearing on the front page of local newspapers. Specific details of the case were regularly broadcast on television, including video testimony from defendant's preliminary examination. Both the Macomb County Sheriff and the Macomb County Prosecutor regularly appeared on television and news radio programs, providing a significant amount of very specific information to the public concerning the case and the impending trial. There was, indisputably, no information spared from public exposure throughout the entire course of this case.
> * * * *
> Our Supreme Court has suggested three possible approaches to voir dire to avoid the danger of prejudice from pretrial publicity: 1) questionnaires prepared by the parties and approved by the court, 2) participation of attorneys in the voir dire, and 3) sequestered questioning of each potential juror. The trial court in the instant matter employed all three methods.
> The initial jury pool numbered over 350. The potential jurors were all required to complete a probing 25–page questionnaire employed to determine their knowledge of the case and whether they had formed any opinions concerning defendant's guilt or innocence. Approximately 50 potential jurors were excused for cause (by stipulation of the parties) based solely upon their questionnaire answers. The prosecution and defendant (and occasionally, the court) then questioned the remaining potential jurors, outside the presence of other potential jurors, over a seven-day period. Over 100 individuals were then excused due to their expressions of potential bias, while others were excused for various reasons unrelated to their knowledge and/or opinions concerning the case. The remaining pool of potential

jurors was then subjected to group questioning, on the record. During this second round of questioning, several additional potential jurors were excused for cause and both sides utilized peremptory challenges. The pool continued to narrow until both the prosecution and the defense expressed satisfaction with the jury. Sixteen jurors were administered an oath and heard the evidence.

*Grant*, 2009 WL 3199493, at *2-*3.

2.      *Clearly Established Law*

Under certain circumstances, pretrial publicity can deprive a defendant of his right to a fair trial. The United States Supreme Court has held that pretrial publicity undermines the fairness of the judicial process when it is either "inherently prejudicial" or when it results in "actual prejudice." Publicity surrounding a judicial proceeding is inherently prejudicial when it fosters a circus-like atmosphere in the courtroom, draining the proceeding of the "solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." *Murphy v. Florida*, 421 U.S. 794, 799 (1975). For example, in *Rideau v. Louisiana*, 373 U.S. 723 (1963), the Supreme Court found such inherent prejudice when a television station aired a 20-minute videotaped interrogation during which the defendant confessed to the crime for which he was eventually convicted.

Even if not so egregious as to create inherent prejudice, pretrial publicity may nevertheless give rise to an inference of actual prejudice. The nature and extent of pretrial publicity may have such a substantial effect on prospective jurors, as evidenced by the voir dire testimony, that a "fair trial [was] impossible." *Murphy*, 421 U.S. at 798. In *Irvin v. Dowd*, 366 U.S. 717, 727 (1961), the Supreme Court found extensive coverage of a defendant's past convictions and his offer to plead guilty to avoid a death sentence prevented a fair trial when nearly all of the prospective jurors reported some belief in the defendant's guilt.

8

In short, to be entitled to habeas relief on the basis of juror exposure to pretrial publicity, petitioner must show either "that prejudice should be presumed or that actual prejudice existed." *Turner v. Calderon*, 281 F.3d 851, 865 (9th Cir. 2002); *see also*, *Dobbert v. Florida*, 432 U.S. 282, 303 (1977); *Murphy*, 421 U.S. at 802.

3.     *Analysis*

Here, there is no question that there was extensive pretrial publicity surrounding the crime. Nevertheless, the Michigan Court of Appeals concluded that this pretrial publicity did not deprive petitioner of a fair trial.  The court reached this conclusion based on several factors.  First, the court reasoned that "while the media coverage of this case was extensive, the coverage provided was primarily factual, detailing the status of the case, testimony elicited during preliminary examination, and other facts that were later admitted as evidence at the trial."  *Grant*, 2009 WL 3199493, at *3. While some of the content of the news reports could be perceived as inflammatory, "that was essentially due to the nature of the crime."  *Id*.  Second, the court explained that the procedures employed by the trial court ferreted out potentially biased jurors, and that the jury that was empaneled had not been corrupted by the pretrial publicity.  The court noted that "[t]here was no impediment to discovery of actual or potential biases, and the voir dire was sufficiently probing to uncover any biases."  *Id*.  The court further noted that "[w]hile essentially all of the jurors indicated being aware of the case, the vast majority of those impaneled had only a passing knowledge of the case and had little exposure to the details.  In addition, all those impaneled swore, under oath, that they could be impartial, notwithstanding any exposure to media reports about the case."  *Id*.  Finally, the court reasoned that the nature of the defense mitigated any potential prejudice from the pretrial publicity.  The court explained that "[d]efendant never claimed to be innocent" and admitted to

9

killing his wife, but argued instead that the killing was not premeditated, and petitioner was successful in this defense by obtaining a conviction for second degree murder, rather than first degree murder. *Id*. at *5. Based on these factors, the court of appeals concluded that "[t]he careful and exhaustive voir dire procedures employed by the trial court demonstrated that the jurors chosen, although familiar with the case, were not biased against" petitioner, and that petitioner's "trial was fundamentally fair and decided by a panel of impartial jurors." *Id*. at *4, *5. The Court should conclude that this determination was reasonable.

Here, petitioner has failed to show that he is entitled to a presumption of prejudice. As the Sixth Circuit has explained, "the few cases in which the Court has presumed prejudice can only be termed extraordinary." *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998). For example, in *Irvin*, *supra*, the defendant was accused of killing a family of six, a crime which "aroused great excitement and indignation" in the community; the pretrial publicity was pervasive and included details of the state's evidence, including the defendant's confession; and 90% of the jury venire, and 8 of the 12 jurors actually seated, had formed some opinion that the defendant was guilty. *See Irvin*, 366 U.S. at 719, 725-26. In *Rideau*, *supra*, the defendant's twenty minute videotaped confession was aired on local television for three successive days. *See Rideau*, 373 U.S. at 724. In *Sheppard v. Maxwell*, 387 U.S. 333 (1966), and *Estes v. Texas*, 381 U.S. 532 (1965), the trials took place in "circus atmosphere[s]" in "courthouse[s] given over to accommodate the public appetite for carnival" or "overrun with television equipment." *See Murphy*, 421 U.S. at 799 (discussing *Estes* and *Sheppard*). In short, prejudice is presumed only where the trial takes place in an "atmosphere utterly corrupted by press coverage," *Dobbert*, 432 U.S. at 303, or where the circumstances deny the defendant a courtroom characterized by "judicial serenity and calm," *Estes*, 381 U.S. at 536, such that the

10

proceedings are "entirely lacking in the solemnity and sobriety to which a defendant is entitled." *Murphy*, 421 U.S. at 799.

Here, petitioner does not allege the type of circus-like proceedings that was involved in these cases and which is necessary to establish a presumption of prejudice. Although there was extensive coverage of the case, an independent review of the articles submitted by petitioner confirms the court of appeals's conclusion that this coverage was largely factual and revealed only matters that were later admitted at trial. "[I]t is well-settled that pretrial publicity itself–'even pervasive, adverse publicity–does not inevitably lead to an unfair trial.'" *DeLisle*, 161 F.3d at 382 (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976)). Further, petitioner does not allege that type of all-encompassing, circus-like, prejudicial atmosphere in either the community or the courtroom that was present in *Irvin*, *Rideau*, *Sheppard*, and *Estes*, and thus he is not entitled to a presumption that the pretrial publicity rendered his trial fundamentally unfair. *See Dobbert*, 432 U.S. at 303; *DeLisle*, 161 F.3d at 383-86; *Bible v. Schriro*, 497 F. Supp. 2d 991, 1007-09 (D. Ariz. 2007).

Nor can petitioner demonstrate that the pretrial publicity resulted in actual prejudice. Petitioner points to no evidence that any of the jurors actually seated had prejudged his guilt or were biased against him. On the contrary, the trial judge took great pains to assure that the jury seated to try petitioner was untainted by the media coverage, first winnowing down the large pool of potential jurors through a questionnaire, and then conducting a sequestered *voir dire* so that one venire member's expressions of bias would not be heard by an unbiased venire member. Each of the seated jurors except for one stated that he or she had not formed an opinion on petitioner's guilt and could decide the case based solely on the evidence presented at trial, and the one who had formed an opinion stated that that opinion could be put aside and the case decided solely based on

11

the evidence.  The Court presumes that these statements were truthful, and petitioner has pointed to nothing to call into question the sincerity of the jurors' assurances.  *See Patton v. Yount*, 467 U.S. 1025, 1036 (1984) (question in case of juror bias is whether juror swore "that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed."); *Howard v. Davis*, 815 F.2d 1429, 1431 (11th Cir. 1987) (habeas relief not warranted on petitioner's claim of juror bias where juror stated he could be impartial despite his relationship with the victim).

The reasonableness of the court of appeals's decision is demonstrated by a number of Supreme Court and court of appeals cases finding no actual or presumed bias where similar numbers of jurors were exposed to pretrial publicity, and where some jurors even had preformed opinions, unlike in petitioner's case.  *See, e.g.*, *Yount*, 467 U.S. at 1027-30, 1040 (habeas relief denied where pretrial publicity covered petitioner's prior conviction for murder, confession, and prior plea of insanity, 161 or 163 venire members had heard of the case and 126 acknowledged they had formed an opinion of defendant's guilt, and 8 of 14 jurors actually seated had at some point formed an opinion of the defendant's guilt, but trial court found that jurors did not hold a fixed opinion when they were seated); *Murphy*, 421 U.S. at 800 (relief denied where 20 of 78 panel members excused for bias but the *voir dire* "indicate[d] no such hostility to petitioner by the jurors who served in his trial as to suggest a partiality that could not be laid aside."); *Ritchie v. Rogers*, 313 F.3d 948, 957, 959 (6th Cir. 2002) (4 of 12 seated jurors had opinions, but they were "not firmly held"); *Hale v. Gibson*, 227 F.3d 1298, 1331-33 (10th Cir. 2000) (34 of 37 examined jurors had prior knowledge of case, 12 had opinions regarding defendant's guilt, and 6 of those 12 were seated on the jury).

The reasonableness of the Michigan Court of Appeals's determination is also demonstrated

by the Supreme Court's recent decision in *Skilling v. United States*, 130 S. Ct. 2896 (2010). That case involved the wire fraud prosecution of Jeffrey Skilling arising from the crash of the Enron Corporation. Skilling's trial occurred in Houston, where Enron was located. Thousands of Houstonians were directly or indirectly affected by the economic effects of Enron's collapse, and both the company's collapse and the ensuing criminal cases resulting therefrom received extensive coverage in both the local and national media. This coverage included personal interest stories in which affected individuals expressed anger toward Enron. *See id.* at 2907-12. Similar to here, the trial court submitted a questionnaire drafted by the court and the parties to 400 prospective jurors. Of those, 90 individuals were granted hardship exemptions and another 119 were excused for cause, hardship, or disability. The remaining jurors were questioned individually outside the presence of other jurors regarding pretrial publicity. *See id.* at 2910-11.

The Supreme Court rejected Skilling's argument that he was denied a fair trial by the pervasive pretrial publicity. After explaining its prior holdings in *Rideau*, *Estes*, and *Sheppard*, the Court first rejected Skilling's claim that he was entitled to a presumption of prejudice, concluding that "[i]mportant differences separate Skilling's prosecution from those in which we have presumed juror prejudice." *Id.* at 2915. Significantly, and equally relevant here, the Court noted that "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type that readers or viewers could not reasonably be expected to shut from sight," such as "Rideau's dramatically staged admission of guilt." *Id.* at 2916. The court rejected the Fifth Circuit's conclusion that "the magnitude and negative tone of media attention directed at Enron" supported a presumption of prejudice, reasoning that "'pretrial publicity–even pervasive, adverse publicity–does not inevitably lead to an unfair trial.'" *Id.* (quoting *Nebraska*

13

*Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976)).  Further, the Court found that the "sheer number

of victims" did not support a presumption of prejudice, because the trial court's "extensive screening

questionnaire and follow-up *voir dire* were well suited to [the] task" of identifying prospective

jurors' connections to Enron.  *Id*. at 2917.  Here, as in *Skilling*, the media coverage was not the type

of extensive, inflammatory coverage that included details of inadmissible evidence at issue in *Estes,*

*Sheppard*, and *Rideau*, and the trial court's questionnaire and sequestered *voir dire* functioned to

identify any potential jurors who had formed opinions based on their exposure to pretrial publicity.

Thus, *Skilling* supports the reasonableness of the Michigan Court of Appeals's decision.

Further, *Skilling* supports the conclusion that petitioner suffered no actual prejudice.  As in

*Skilling*, the trial court engaged in an extensive written and oral *voir dire* process to fully explore

the prospective jurors' biases, *see id*. at 2918, and "examined each prospective juror individually,

thus preventing the spread of any prejudicial information to other venire members."  *Id*. at 2919.

Further, as in *Skilling*, the trial court here instructed the jurors that they were to decide the case

solely based on the evidence presented at trial.  *See id*. at 2918 n.21.  Here, as in *Skilling*, the trial

court's extensive *voir dire* process "successfully secured jurors who were largely untouched by"

pretrial publicity.  *Id*. at 2920.[2]

Finally, petitioner has failed to show that any of the jurors seated were actually biased

against him.  It is true that some of these jurors had knowledge of the case from following news

reports.  None of those jurors, however expressed any opinion on petitioner's guilt, and each

---

[2]Petitioner contends that the bias of the jury is demonstrated by the fact that a large percentage
of the venire members indicated on the questionnaires that they thought petitioner was guilty or
responsible for the victim's death.  As the Supreme Court explained, however, "[s]tatements by
nonjurors do not themselves call into question the adequacy of the jury-selection process; elimination
of these venire members is indeed one indicator that the process fulfilled its function."  *Skilling*, 130 S.
Ct. at 2920 n.24.

indicated that they had no opinion and could decide the case based on the evidence presented at trial. As the Court has repeatedly explained, "[p]rominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*." *Skilling*, 130 S. Ct. at 2914-15 (emphasis in original); *see also*, *id*. at 2925. Indeed, it is not required that prospective jurors have formed no opinions on the matter. *See Murphy*, 421 U.S. at 800; *Irvin*, 366 U.S. at 722 (jurors are not required to be "totally ignorant of the facts and issues involved" and "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case."); *Reynolds v. United States*, 98 U.S. 145, 155-56 (1879). The only relevant questions are whether the juror swore "that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton*, 467 U.S. at 1036. Here, a review of the *voir dire* does not demonstrate that any of the jurors (except for one) that were actually seated in petitioner's trial had formed any opinion on the case, much less has petitioner demonstrated any reason why these jurors' protestations of impartiality should not have been believed by the trial court.

In short, petitioner "failed to establish that a presumption of prejudice arose or that actual bias infected the jury that tried him." *Skilling*, 130 S. Ct. at 2925. The Michigan Court of Appeals's determination, based on a thorough review of the facts and application of the relevant Supreme Court precedents, was therefore neither contrary to, nor an unreasonable application of, clearly established federal law. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.    *Petitioner's Statement (Claim II)*

In his second claim, petitioner contends that his statement to the police should have been

15

suppressed because the police took the statement in violation of an agreement with petitioner's counsel that they would not question him upon his arrest. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

      1.    *Background Relating to this Claim*

During the investigation into his wife's disappearance, petitioner retained attorney David Griem to represent him. After the focus of the investigation turned to petitioner, Mr. Griem and the Macomb County Sheriff's Department agreed that, upon petitioner's arrest, the Department would contact Mr. Griem prior to questioning petitioner. Prior to trial, petitioner filed a motion to suppress his statement to the police, arguing that the deputies who questioned him had violated this agreement. The trial court conducted an evidentiary hearing, the testimony at which was accurately summarized by the Michigan Court of Appeals:

> The evidence at the *Walker* hearing established that when defendant was apprehended he was transported to the hospital where he was placed in custody. After receiving medical attention, when defendant was asked if he wanted to speak to the police, defendant stated that he first wished to speak to his attorney, Mr. Griem. Defendant had retained Mr. Griem shortly after his wife's disappearance. Mr. Griem had many contacts with the Macomb County Sheriff's Department during the investigation into Tara Grant's reported disappearance. During several of these contacts, representatives of the department agreed that all contact with defendant would be directed through his counsel, to advise counsel if defendant was apprehended, and to not question defendant. Several officers affirmatively acknowledged at the *Walker* hearing that this agreement was in place. Despite the agreement, it is undisputed that Mr. Griem was not immediately notified when defendant was apprehended at approximately 6:30 a.m. on March 4, 2007. Mr. Griem, unaware that defendant had been located and was in custody, terminated his representation of defendant via a live news broadcast several hours later.
>
> When he asked to speak to Mr. Griem, the Macomb County Sheriff's Department advised defendant that Mr. Griem had terminated their attorney-client relationship on television that morning. Defendant was then asked if he wanted to look for a local attorney. He declined the offer. Defendant indicated that he wanted to speak with the officer in charge of the case. Defendant then advised the officer in charge, by telephone, that he wished to speak to him about the matter. When the officer arrived at the hospital several hours later, defendant waived his *Miranda*

16

rights and made a verbal and written confession.

*Grant*, 2009 WL 3199493, at *6.

       2.    *Clearly Established Law*

As the Supreme Court explained in *Jackson v. Denno*, 378 U.S. 368 (1964), "a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession." *Jackson*, 378 U.S. at 376. "Determining whether a confession is 'voluntary' for due process purposes entails an examination into the 'totality of the circumstances' to determine whether the confession was procured by acceptable techniques that draw upon an essentially free and unconstrained choice or by unacceptable tactics that extract their results from an overborne will. The critical line of distinction is between 'self-direction' and 'compulsion.'" *Cooper v. Scroggy*, 845 F.2d 1385, 1390 (6th Cir. 1988) (citing *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)); *accord Dickerson v. United States*, 530 U.S. 428, 434 (2000). It is not enough that a defendant's will was "overborne" by some factor for which state officials are not responsible. "Coercive police conduct is a necessary prerequisite to the conclusion that a confession was involuntary, and the defendant must establish a causal link between the coercive conduct and the confession." *Carter v. Johnson*, 131 F.3d 452, 462 (5th Cir. 1997) (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). There is no bright line test for determining whether a confession is voluntary, nor is any one factor dispositive. Rather, a court must "look[] to the totality of the circumstances concerning whether a defendant's will was overborne in a particular case. Relevant factors may include the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishments, such as the deprivation of food or

17

sleep." *United States v. Mahan*, 190 F.3d 416, 422-23 (6th Cir. 1999) (internal quotation and citation omitted); *accord*, *Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir. 1997); *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994).

For purposes of habeas review, "the ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a [legal] matter for independent federal determination." *Miller v. Fenton*, 474 U.S. 104, 112 (1985).   However, a state court's findings of historical fact are presumed by this Court to be correct unless rebutted by petitioner with clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).  *See generally*, *Townsend v. Sain*, 372 U.S. 293, 309 n.6 (1963) (factual findings entitled to a presumption of correctness under the habeas statutes are those relating to "basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators.") (internal quotation omitted).  Thus, "subsidiary factual questions, such as whether . . . in fact the police engaged in the intimidation tactics alleged by the defendant are entitled to the § 2254[(e)(1)] presumption." *Miller*, 474 U.S. at 112; *see also*, *id*. at 117.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court considered the applicability of the Fifth Amendment's Self-Incrimination Clause to custodial interrogations by the police.  The Court ruled that, in some circumstances, statements made while in custody can violate the Self-Incrimination Clause even if the statement was otherwise "voluntary" under the Due Process Clause.  As the Court has more recently explained, the *Miranda* decision

> concluded that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be "accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself." [*Miranda*, 384 U.S.] at 439.  Accordingly, we laid down "concrete guidelines for law enforcement agencies and courts to follow." *Id*., at 442.  Those guidelines established that the admissibility in evidence of any

> statement given during custodial interrogation of a suspect would depend on whether the police provided the suspect with four warnings. These warnings (which have come to be known colloquially as "Miranda rights") are: a suspect "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to questioning if he so desires." *Id.*, at 479.

*Dickerson v. United States*, 530 U.S. 428, 435 (2000) (parallel citations omitted). The *Miranda* Court explained that if the suspect indicates that he wishes to remain silent, "the interrogation must cease." *Miranda*, 384 U.S. at 474. Similarly, if the suspect requests counsel "the interrogation must cease until an attorney is present." *Id.*; *see also*, *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Although it has been characterized otherwise at times, the rule of *Miranda* is of federal constitutional dimension. *See Dickerson*, 530 U.S. at 438-40. Thus, claims based on the right to counsel at questioning recognized in *Miranda* are cognizable on habeas review. *See id.* at 439 n.3; *Thompson v. Keohane*, 516 U.S. 99, 107 n.5 (1995).

In determining the validity of the police interrogation, the ultimate issues of whether petitioner waived his rights to remain silent and to counsel are legal determinations to be reviewed under § 2254(d)(1). *See, e.g.*, *Thompson*, 516 U.S. at 112-13 (determination of whether interrogation was a "custodial interrogation" under *Miranda* is a legal determination not subject to the presumption of correctness for state court findings of historical fact); *Brewer v. Williams*, 430 U.S. 387, 397 n.4 (1977) (same as applied to question of whether petitioner validly waived his Sixth Amendment right to counsel). However, as with the voluntariness issue, the state courts' resolution of the underlying historical facts are presumed correct unless rebutted by clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1).

      3.      *Analysis*

Petitioner contends that his waiver of his *Miranda* rights was invalid because the deputies who questioned him violated the agreement with Mr. Griem.  The Michigan Court of Appeals rejected this claim, explaining that petitioner had failed to provide any "authority to suggest that where an agreement not to speak to a suspect is in place between police and defense counsel, the agreement survives counsel's resignation or that a purported violation of the agreement requires the suppression of any statement made in contravention of the agreement." *Grant*, 2009 WL 3199493, at *6.  The court of appeals noted there was a short time between petitioner's arrest and Mr. Griem's public announcement of his resignation; there was no indication that the police deliberately withheld news of petitioner's arrest in anticipation of Mr. Griem's resignation; petitioner was asked if he wanted no counsel and was not prevented from contacting Mr. Griem on his own; and several hours elapsed between the time petitioner was informed of Mr. Griem's resignation and the time he indicated he wished to speak with the police, and several more hours elapsed after that before the deputies actually questioned petitioner. *See id*. at *7.  The court reasoned that in light of Mr. Griem's resignation, "it was reasonable to conclude that the police no longer had to advise or consult with him before speaking with" petitioner. *Id*.  The court further reasoned:

> [W]hen advised that Mr. Griem had resigned, defendant himself initiated contact with the officer in charge. The undisputed testimony at the *Walker* hearing indicates that defendant attempted to speak to two different Macomb County Sheriff's Deputies and a nurse about his circumstances. All terminated any discussion. The deputies advised defendant that if he wanted to speak to anyone about the case he should speak to the officer in charge. Defendant was given a telephone and spoke to the officer in charge. Defendant asked the officer to come to the hospital so he could make a statement. The officer drove four hours to reach the hospital. Only after Mirandizing defendant did the questioning begin. As stated in *Edwards v. Arizona*, 451 U.S. 477, 484–485 101 S.Ct. 1880, 1885 (U.S.Ariz., 1981), "an accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police* " (emphasis added). There was no clear

> error in the trial court's determination that defendant's confession was freely and
> voluntarily given, and that the statements were not subject to suppression.

*Id.* Finally, the court rejected petitioner's argument that, had the police immediately advised Mr. Griem of his arrest, Mr. Griem likely would have spoken to him and he would not have waived his right to counsel. Calling this argument "pure speculation," the court observed that Mr. Griem testified that "although he had advised [petitioner] not to speak to the media or law enforcement, [petitioner] did, nevertheless speak to the media and to law enforcement officials while Mr. Griem actively served as defendant's retained counsel." *Id.* at *8. Further, Mr. Griem testified that he had made the decision to withdraw several days before petitioner's arrest, but had been unable to communicate this to petitioner in light of petitioner's flight. "He testified that he knew at the time he made his public statement that the police were looking for [petitioner] and that [petitioner] would be taken into custody if found. Mr. Griem did not testify that he would have continued on as [petitioner's] retained counsel if he had been advised of [petitioner's] apprehension prior to his media statement." *Id.*

Before analyzing petitioner's claim, it is important to note the limited nature of his claim. Petitioner does not contend that either his waiver of his *Miranda* rights or his statement itself was involuntary in the sense that he was coerced or his will overborne by inappropriate police conduct. Nor does petitioner claim that there was any defect in the *Miranda* warnings or that he did not understand his *Miranda* rights. Likewise, he does not dispute that it was he who initiated contact with the police and indicated a desire to speak with the officer in charge of the case. Nor does petitioner contend that the deputies interfered with his Sixth Amendment right to counsel, as

opposed to his Fifth Amendment right to counsel under *Miranda* and *Edwards*.[3]  Petitioner's claim

is limited to the violation of the agreement between Mr. Griem and the Department.  Essentially,

petitioner argues that in light of that agreement, any subsequent waiver of his right to counsel was

invalid.  This claim is without merit, and the Michigan Court of Appeals's rejection of the claim was

therefore neither contrary to, nor an unreasonable application of, clearly established federal law.

As the court of appeals observed, petitioner has pointed to no authority suggesting that the

violation of an agreement between the police and counsel for a suspect that the suspect will not be

questioned requires suppression of a statement where the dictates of *Miranda* and *Edwards* are

otherwise observed.[4]  On the contrary, the caselaw in this area suggests the opposite.  In *Montejo*

*v. Louisiana*, 556 U.S. 778 (2009), the Court, analyzing the Sixth Amendment right to counsel,

observed that a "defendant may waive the right whether or not he is already represented by counsel;

the decision to waive need not itself be counseled."  *Id*. at 786 (citing *Michigan v. Harvey*, 494 U.S.

344, 352-53 (1999)).  Although a Sixth Amendment case, the Court observed that the waiver

question was essentially the same as under the Fifth Amendment and *Miranda*.  *See id*. ("And when

a defendant is read his *Miranda* rights (which include the right to have counsel present during

interrogation) and agrees to waive those rights, that typically does the trick, even though the

*Miranda* rights purportedly have their source in the Fifth Amendment[.]").  In *United States v.*

---

[3]Nor could petitioner raise such a claim.  The Sixth Amendment right to counsel attaches only at or after the initiation of criminal proceedings by way of formal charge, preliminary hearing, indictment, information, or arraignment.  *See Fellers v. United States*, 540 U.S. 519, 523 (2004); *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991).  There is no dispute that, at the time petitioner was questioned, no criminal proceedings against him had been initiated.

[4]Because it does not affect the resolution of the claim, I assume for the sake of argument that there was, in fact, a violation of the agreement.  I note, however, that in light of the timing of events and Mr. Griem's testimony, the conclusion that there was in fact no violation of the agreement was a reasonable determination of the facts, *see* 28 U.S.C. § 2254(d)(2).

*Cristobal*, 293 F.3d 134 (4th Cir. 2002), the court rejected a defendant's claim that his *Miranda* waiver was invalid because he had previously been appointed counsel and the police concealed both this fact from him and notice of the interrogation from counsel.  The court explained that "because Cristobal's voluntary decision to speak was made with full awareness and comprehension of his *Miranda* rights, the waiver was valid, even if it could be shown that the police knew counsel had been appointed and concealed that fact from Cristobal."  *Id*. at 142 n.10 (citing *Moran v. Burbine*, 475 U.S. 412, 423-24 (1986)).  In *Moran*, the Supreme Court held that the police officers' failure to inform the defendant that counsel had been retained for him and that counsel had called the station did not render the waiver of his rights involuntary or unknowing.  The Court explained that "[o]nce it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law."  *Moran*, 475 U.S. at 423-24.

The upshot of these cases, and of *Montejo* in particular, is that "a defendant may waive his *Miranda* rights whether or not he is already represented by counsel, as long as that waiver is voluntary, knowing, and intelligent."  *United States v. Green*, ___ Fed. Appx. ___, ___, 2013 WL 1122632, at *10 n.10 (3d Cir. Mar. 19, 2013).  That, at most, is all that happened here.  Petitioner himself initiated contact with the deputies, indicating his desire to speak with them.  He was advised of his *Miranda* rights and validly waived those rights.[5]  The fact that he may have been represented by counsel, or that the police agreed with counsel that they would not speak with petitioner, does

---

[5]A finding that petitioner voluntarily waived his right to counsel is buttressed by Mr. Griem's testimony that petitioner repeatedly refused to follow his advice.  *See Self v. Collins*, 973 F.2d 1198, 1218-19 (5th Cir. 1992).

not render petitioner's waiver, after he initiated further contact, involuntary or unintelligent. Petitioner points to no decision from any court which even arguably suggests the rule he seeks to apply here.

The only case upon which petitioner relies, *Brewer v. Williams*, 430 U.S. 387 (1977), does not support petitioner's argument.  In that case, the defendant was arrested in Davenport, Iowa, for the abduction of a young girl in Des Moines.  Following his arrest, the defendant was arraigned in Davenport, triggering the Sixth Amendment right to counsel.  Petitioner's counsel in Des Moines spoke with the police, and they agreed that the police would not question petitioner on the drive from Davenport to Des Moines.  On the drive, one of the officers engaged in a conversation with the defendant regarding, among other topics, religion.  Knowing that the defendant was a religious man with mental health problems, the officer gave the defendant what has come to be known as the "Christian burial speech," suggesting that the victim deserved a Christian burial that she would not be able to have if her family could not find her body.  In response, the defendant confessed that he had killed the girl and directed the officers to her body.  *See id*. at 390-93.  The Court concluded that the defendant's statements were inadmissible.  It did not do so however, as petitioner suggests, because the police violated an agreement with counsel not to talk to the defendant.  Rather, it did so because the Sixth Amendment right to counsel had attached, and thus the Sixth Amendment itself barred the police from reinitiating any contact outside the presence of counsel.  "There can be no serious doubt," the Court explained, that the detective had "deliberately and designedly set out to elicit information from Williams just as surely as and perhaps more effectively than if he had formally interrogated him."  *Id*. at 399.  Indeed, the Court found the agreement irrelevant, concluding that it did not need to address the State's argument that the agreement not to talk to the

24

defendant was unenforceable because "we do not deal here with notions of offer, acceptance, consideration, or other concepts of the law of contracts. We deal with constitutional law." *Id*. at 401 n.8.  The Court further held that the defendant had not waived his right to counsel in light of his repeated assertion of that right, and his speaking only in response to the detective's Christian burial speech.  *See id*. at 405-06.  The Court made clear, however, that it was *not* holding that "under the circumstances of this case Williams could not, without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments."  *Id*.  The Court held "only . . . that he did not."  *Id*. at 406.

Apart from the irrelevant fact of an agreement between petitioner's attorney and the police, petitioner's case bears none of the circumstances present in *Brewer*.  Unlike in *Brewer*, petitioner's Sixth Amendment right to counsel had not attached.  Unlike in *Brewer*, the police did not engage in any conversation with petitioner designed to elicit an incriminating response, nor did petitioner repeatedly assert his desire to speak only in the presence of counsel.  On the contrary, it was petitioner himself who repeatedly attempted to speak with the police who arrested him, police who turned down petitioner's invitation and offered to allow petitioner to speak with an attorney.  It was petitioner who called the officer in charge to tell him that he wanted to talk, and it was only after petitioner was advised of his rights and unequivocally waived those rights that the officer took petitioner's statement.  Nothing in *Brewer* supports a conclusion that petitioner did not validly waive his Fifth Amendment right to counsel, and thus the court of appeals's decision was neither contrary to nor an unreasonable application of *Brewer*, or any other clearly established federal law.  *See Torres v. Dennehy*, 615 F.3d 1, 6-7 (1st Cir. 2010) (state court's decision not contrary to or an unreasonable application of *Brewer* where it was petitioner who insisted that he wanted to talk);

25

*Crowe v. Terry*, 426 F. Supp. 2d 1310, 1332 (N.D. Ga. 2005) (distinguishing *Brewer* because "the evidence shows that neither Sheriff Lee nor Judge James violated Petitioner's Sixth Amendment right to counsel. They did not "deliberately elicit" incriminating statements from him, and Petitioner waived his right to counsel by initiating contact with them and acting contrary to counsel's advice."), *aff'd*, 490 F.3d 840 (11th Cir. 2007). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.      *Recommendation Regarding Certificate of Appealability*

1.      *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to

26

deserve encouragement to proceed further.""" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84.  Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable."  *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254.  The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue."  FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id*., advisory committee note, 2009 amendments.  In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2.      *Analysis*

Here, if the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also deny petitioner a certificate of appealability.  With respect to petitioner's pretrial publicity claim, it is not reasonably debatable that the circumstances justifying a presumption of prejudice are not present here.  As explained above, the circumstances of petitioner's

27

case are far removed from those present in *Rideau*, *Irvin*, and *Sheppard*, a conclusion confirmed by the Court's recent decision in *Skilling*.  Further, in light of the fact that the trial court engaged in an extensive selection procedure designed to weed out biased jurors, and in light of the absence of any evidence that the jurors who sat on petitioner's jury were biased, it is not reasonably debatable that petitioner has failed to demonstrate actual prejudice arising from the pretrial publicity.  With respect to petitioner's *Miranda* claim, it is clear that petitioner, with full knowledge of his rights to remain silent and to speak with counsel, knowingly and voluntarily waived those rights without any prompting from the police.  The resolution of this claim is therefore not reasonably debatable.  Accordingly, the Court should deny petitioner a certificate of appealability.

G.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.  If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the

28

objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated:  March 27, 2013          S/Paul J. Komives
                                Paul J. Komives
                                United States District Judge

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 27, 2013, by electronic and/or ordinary mail.

                                S/Shawntel R. Jackson
                                Case Manager