UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEPHEN C. GRANT,

        Petitioner,

v.

        Case Number 11-12771
        Honorable David M. Lawson
        Magistrate Judge Paul J. Komives

KENNETH T. McKEE,

        Respondent.

_____/

## ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION, OVERRULING PETITIONER'S OBJECTIONS, AND DENYING PETITION FOR WRIT OF HABEAS CORPUS

Before the Court are the petitioner's objections to a report issued by Magistrate Judge Paul J. Komives recommending that petitioner Stephen C. Grant's petition for a writ of habeas corpus be denied. Grant killed his wife by strangulation and chopped up her body. Before the body was discovered, Grant appeared in the media with the story that his wife was missing, and he pleaded for her return. The case received considerable public attention, requiring extraordinary measures to select a jury. After parts of the body were discovered, and Grant was apprehended as a fugitive, Grant was charged with first-degree murder and mutilating a dead body. He pleaded guilty to the mutilation charge, and a jury found him guilty of second-degree murder. After his convictions were affirmed on direct appeal, Grant filed his habeas petition through counsel arguing that pretrial publicity rendered his trial unfair in the local venue, and his confession should have been suppressed because the police violated an agreement that no effort would be made to interrogate Grant when he was apprehended until his attorney was notified and consulted with him. Grant's attorney filed objections to Judge Komives's report and recommendation. The Court has conducted a *de novo* review of the petition, response, and state court record in light of the objections filed, and agrees

with the magistrate judge's conclusions. Therefore, the Court will overrule the objections, adopt the magistrate judge's recommendation, and deny the petition.

I.

The magistrate judge discussed the facts of the case and its procedural history, as summarized by the state appellate court. However, in light of the objections, especially concerning the admissibility of Grant's confession, the facts bear repeating here.

On February 9, 2007, Stephen Grant killed his wife, Tara Grant. The two were involved in a verbal and physical altercation in their home which resulted in the petitioner strangling Mrs. Grant. Immediately after her death, the petitioner hid the body in his car and purported to have no idea of Mrs. Grant's whereabouts. Two days later, the petitioner chopped her body into pieces and placed the pieces in a large Rubbermaid container.

On February 14, five days after Mrs. Grant's death, the petitioner reported Mrs. Grant missing to the police. The following day, he hired David Griem as his attorney. Griem established an agreement with the Macomb County Sheriff's office that all communication between the police and the petitioner was to be done through Griem and that the police were not to speak to the petitioner himself. Despite that agreement, the petitioner initiated contact with the police, without Griem's prior knowledge, on at least one occasion. The investigation into Mrs. Grant's disappearance eventually led police to search the petitioner's house on March 2, 2007. The police discovered part of Mrs. Grant's body in the garage and issued a warrant for the petitioner's arrest. The petitioner fled to northern Michigan.

Griem spoke to Captain Wickersham of the Macomb County Sheriff Department several times on March 2, telling him not to talk to the petitioner. Griem also spoke to Captain Wickersham

on March 3, again telling him not to talk to the petitioner without Griem present and also asking to be informed immediately upon the petitioner's arrest. But on March 4, around nine or ten in the morning, Griem announced his resignation as the petitioner's attorney to the local news media, believing that this was the best way to assure that the news reached the now fugitive petitioner.

The petitioner was found in the woods in northern Michigan at approximately 6:30 a.m. on March 4. Griem was not notified of the petitioner's arrest at that time and only became aware of the arrest on March 5 or 6. The petitioner was brought to Northern Michigan Hospital, where he was treated for frostbite and hypothermia and was guarded constantly by police. Later that day, March 4, the petitioner asked to speak with Griem, but the police informed him that Griem had resigned as his attorney. Upon hearing this, the petitioner asked to speak with Detective Kozlowski, the investigating officer in charge of the case. The petitioner spoke with Kozlowski twice on the phone and asked him to come to the hospital to speak with the petitioner in person. That required a four-hour drive north for Kozlowski. While waiting for Kozlowski's arrival, a police officer asked the petitioner if he would like another attorney and offered the petitioner a phonebook to find one. The petitioner declined the offer.

Detective Kozlowski arrived at Northern Michigan Hospital the evening of March 4 and took a three-hour recorded statement from the petitioner. Kozlowski first read the petitioner his *Miranda* rights. The petitioner signed a document stating that he waived those rights and also orally waived them for the tape recorder. Kozlowski testified that the petitioner was not under the influence of any drugs or alcohol, nor was he subjected to any sort of coercion from the police. During the conversation, the petitioner confessed to killing Tara Grant and described in detail how he cut up and disposed of her body.

The petitioner's case received a great deal of media attention. During the roughly two-week period that Mrs. Grant was missing, the petitioner went on the news multiple times pleading for her to come home. News reporters followed Griem constantly during the petitioner's three-day disappearance in March. Ten days before trial, the petitioner's attorney granted an interview to the local news. More than fifty news articles were published about the petitioner's case.

Because of the pre-trial publicity, the court took several precautionary measures to ensure that jurors were not predisposed to assume the petitioner's guilt. The prospective jurors were required to fill out a 23-page questionnaire and were questioned individually by the judge and attorneys for both parties. The process took seven days; 182 of 372 jurors were excused for cause. In the panel of jurors that was selected, fifteen of the sixteen jurors had at least some prior knowledge of the case. The petitioner moved for a change of venue before trial, and the judge denied the motion.

The jury found the petitioner guilty of second-degree murder, Mich. Comp. Laws § 750.317. On February 21, 2008 the petitioner was sentenced to 50 to 80 years in prison. Before trial, the petitioner had pleaded guilty to mutilation of a dead body, Mich. Comp. Laws § 750.160, and received a sentence of six to ten years. The petitioner's convictions and sentences were affirmed on direct appeal. *People v. Grant*, No. 284100, 2009 WL 3199493 (Mich. Ct. App. Oct. 6, 2009), *lv. to appeal den.*, 485 Mich. 1128, 779 N.W.2d 803 (2010).

In his habeas petition, Grant styled his two claims as follows:

I. THE STATE TRIAL COURT REVERSIBLY ERRED IN DENYING THE DEFENSE REQUEST FOR A CHANGE OF VENUE, WHERE NEARLY HALF OF THE NEARLY FOUR HUNDRED POTENTIAL JURORS QUESTIONED DURING THE VOIR DIRE WERE EXCUSED FOR CAUSE FOR CONCLUDING THAT MR. GRANT WAS GUILTY OR COULD NOT AFFORD HIM HIS CONSTITUTIONAL RIGHT TO THE PRESUMPTION OF INNOCENCE.

> II. THE STATE TRIAL COURT REVERSIBLY ERRED IN DENYING THE DEFENSE MOTION TO SUPPRESS MR. GRANT'S CUSTODIAL STATEMENT TO THE POLICE, AS THE POLICE VIOLATED AN AGREEMENT WITH MR. GRANT THAT THEY WOULD CONTACT HIS ATTORNEY AS SOON AS HE WAS TAKEN INTO CUSTODY, AND THAT THEY WOULD NOT SEEK TO QUESTION HIM UPON HIS ARREST, AND THUS THE PURPORTED WAIVER OF HIS CONSTITUTIONAL RIGHT TO COUNSEL AT THE CUSTODIAL INTERROGATION WAS INVALID.

Def.'s Mem. in Supp. of Pet. for Writ of Hab. Corp. at 26, 38. The case was referred to Magistrate Judge Komives, who filed a report and recommendation on March 27, 2013. Judge Komives recommended that the Court deny both the petition and a certificate of appealability. The petitioner filed timely objections.

## II.

When timely objections to a report and recommendation are filed, the Court gives fresh review to those issues that are contested. "A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

### A.

The magistrate judge applied the deferential review standard mandated by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. As amended, 28 U.S.C. § 2254(d) permits a federal court to issue the writ only if the state court decision on a federal issue "was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court," or it amounted to "an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d)(1), (2); *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (holding that the AEDPA

requires a federal habeas court to review state court decisions with "deference and latitude," and "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's ruling." (quoting *Yarborough v. Alvarado*, 541 U.S. 652 (2004))). The Sixth Circuit observed recently that "[t]his is a very high standard, which the [Supreme] Court freely acknowledges." *Peak v. Webb*, 673 F.3d 465, 472 (6th Cir. 2012).

The petitioner has not questioned the application of that standard in this case.

B.

In rejecting the petitioner's venue challenge, the magistrate judge concluded that the pretrial publicity did not warrant a finding of presumptive prejudice, and he found that the state courts reasonably concluded that no actual prejudice existed. The petitioner has not objected to either finding as such. Instead, he argued in his objections that because so many in the jury venire were excused for cause, the state courts' refusal to change venue was an unreasonable application of *Rideau v. Louisiana*, 373 U.S. 723 (1963), and *Irvin v. Dowd*, 366 U.S. 717 (1961). The Court disagrees.

The Supreme Court has held that a court should grant a defendant a change of venue if prejudicial pretrial publicity jeopardizes a defendant's right to a fair trial by an impartial jury. *Irvin*, 366 U.S. at 722-24; *Ritchie v. Rogers*, 313 F.3d 948, 956 (6th Cir. 2002). Prejudice resulting from pretrial publicity can be presumptive or actual. *Nevers v. Killinger*, 169 F.3d 352, 362 (6th Cir. 1999), *abrogated on other grounds*, *Harris v. Stovall*, 212 F.3d 940, 942-43 (6th Cir. 2000). Presumptive prejudice from pretrial publicity occurs in a case where an inflammatory, circus atmosphere pervades both the courthouse and surrounding community. *Ritchie*, 313 F.3d at 952-53;

*Gall v. Parker*, 231 F.3d 265, 309 (6th Cir. 2000); *Nevers*, 169 F.3d at 362-63; *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998) (en banc). For that presumption to apply, the trial must be entirely lacking in the solemnity and the sobriety required of a system that subscribes to any notion of fairness and rejects the verdict of a mob. *Gall*, 231 F.3d at 310; *Nevers*, 169 F.3d at 363. Cases where prejudice from pretrial publicity is presumed are extremely rare, and even pervasive, adverse publicity does not inevitably lead to an unfair trial. *DeLisle*, 161 F.3d at 382. The record does not establish such an atmosphere surrounding Grant's trial, and the petitioner does not seriously contend such conditions existed.

In a case where pretrial publicity cannot be presumed to be prejudicial, the trial court must still determine whether the publicity rises to the level of actual prejudice. *Ritchie*, 313 F.3d at 962; *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007). The primary tool for determining if actual prejudice has occurred is a searching *voir dire* of prospective jurors. *Ibid.* The court must review the media coverage itself and the substance of the jurors' statements at *voir dire* to determine whether a "community-wide sentiment" exists against the defendant. *Nevers*, 169 F.3d at 366. Negative media coverage by itself is insufficient to establish actual prejudice, and the existence of a juror's preconceived notion as to the guilt or innocence of the defendant, without more, is not sufficient to rebut the presumption of a prospective juror's impartiality. *Id.* at 366-67.

The petitioner here does not challenge the impartiality of any particular seated juror. Instead, he contends that because a high percentage of potential jurors were excused for cause, venue should have been changed. However, when assessing actual prejudice, the focus cannot be trained on excused jurors; instead it must concentrate on the jury as empaneled. *See Skilling v. United States*, 561 U.S. 538, 395-99 (2010). Moreover, the trial court in the petitioner's case took several

measures to ensure that any biases of the prospective jurors were uncovered. The court required the prospective jurors to fill out a 23-page questionnaire, and each was questioned individually by the judge and the attorneys for both sides. The trial court excused over 180 prospective jurors for cause during the *voir dire*. That number does not establish a "community-wide sentiment" against the petitioner. Instead, it suggests that this process was successful in uncovering any prejudices. The Supreme Court in *Skilling* found the *voir dire* techniques employed by that trial court, which mirrored the techniques used in the petitioner's case, to be acceptable and to have eliminated any prejudice among the jurors. *Skilling*, 561 U.S. at 388-93. Based on the record of jury selection in this case, it appears that the same finding is justified here. The trial court, therefore, cannot be said to have unreasonably applied federal law in its choice of techniques for choosing an impartial jury. The petitioner has not demonstrated that he suffered any actual prejudice during his trial.

Finally, the petitioner states that the Michigan courts unreasonably applied *Rideau* and *Irvin*. However, those cases are so factually distinct from the petitioner's that they serve as no useful guidepost here, except in the most general sense. In *Rideau*, the local news thrice aired a video of a twenty-minute "interview" between the defendant and a sheriff in which the defendant confessed to the alleged crimes. *Rideau*, 373 U.S. at 724. The Court found that this publicity denied the defendant due process, since "the people of [the] Parish saw and heard, not once but three times, a 'trial' of [the defendant] in a jail, presided over by a sheriff, where there was no lawyer to advise [the defendant] of his right to stand mute." *Id.* at 727. In *Irvin*, the local newspapers that served 95 percent of the community repeatedly denounced the defendant as guilty. *Irvin*, 366 U.S. at 725-28. The media released his prior criminal history, announced that he had confessed to the murders of which he was accused, and aired the opinions of local residents who proclaimed the defendant to

be guilty. *Ibid*. In contrast, the state court's factual findings in this case were that none of the media coverage of the petitioner's trial denounced him as guilty or suggested that he had confessed to the crimes. *Grant*, 2009 WL 3199493, at *3. The petitioner was not denied a fair trial by an impartial jury.

C.

The petitioner filed a more detailed objection to the magistrate judge's conclusion that the confession — and the state's procurement of it — did not offend the Fifth Amendment. In his objections, the petitioner readily acknowledges that he can make no claim that his statement to Detective Kozlowski was involuntary, or that the police used any coercion or trickery to make him talk. He also concedes that the police properly terminated any attempt to question him once he asked to speak to his erstwhile attorney, David Griem, until the petitioner himself initiated further communication with authorities, thereby honoring the rule of *Edwards v. Arizona*, 451 U.S. 477 (1981). Instead, the petitioner contends that he could not validly waive his right to counsel when the police violated the agreement they made with attorney Griem that they would not seek to interrogate Grant without Griem's knowledge and consent. The petitioner relies squarely on *Brewer v. Williams*, 430 U.S. 387 (1985), for the proposition that when such an agreement has been struck with an accused's attorney, no waiver of the right to counsel can occur in derogation of that agreement. The petitioner does not read *Brewer* correctly.

In *Brewer*, defendant Williams was suspected of abducting and murdering a child in Des Moines, Iowa, and a warrant was issued for his arrest. A lawyer contacted the police on his behalf, arranged for Williams to surrender to police in Davenport, a city 160 miles away, and obtained an agreement that the police would not question Williams when they transported him back to Des

Moines. Williams was arrested and arraigned in Davenport, and a second lawyer confirmed the agreement that no questioning would occur. The second lawyer was denied permission to ride with Williams back to Des Moines. During the 160 mile drive, the defendant repeatedly stated that he would "tell [police] the whole story" once he arrived in Des Moines. 430 U.S. at 392. Yet one of the police officers, who was aware of the defendant's history of mental illness and deeply held religious convictions, struck up a conversation regarding the burial of the victim. During that conversation, the defendant admitted that he knew where the victim's body was, and that evidence was presented at trial. The Supreme Court held that the confession was inadmissible, because it violated the defendant's Sixth Amendment right to counsel, and the state failed to show that the defendant waived that right before speaking to the detective during the ride back to Des Moines. *Id.* at 400-01, 404.

The right to counsel in this case emanates from the Fifth Amendment, not the Sixth, since no formal proceedings had been commenced against Grant at the time. But that difference is immaterial, because the analysis of the question of waiver of the right to counsel under either amendment is essentially the same. *See Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). Nonetheless, there is nothing in *Brewer* to suggest that a police officer's breach of an agreement between a defendant's attorney and the police would be sufficient to invalidate a waiver of the right to counsel. Rather, the main issue in *Brewer* was whether the defendant ever did waive his right to counsel at all. *Brewer*, 430 U.S. at 397. The state courts found that the defendant had done so, primarily because of "the absence on the Defendant's part of any assertion of his right." *Id.* at 401. The Supreme Court, however, held that the burden was on the government to produce evidence of an affirmative waiver of the right, and that the government did not do so. *Id.* at 402.

The petitioner argues that the Supreme Court's decision in *Brewer* turned on the existence of the agreement between the police and the defendant's counsel. That is incorrect. Although the Supreme Court discussed in detail the existence of that agreement, it did so only to counter the assertion that a waiver of the right to counsel could be implied from the defendant's willingness to respond to the detective's subtle provocation to talk. The Court observed that Williams told the detective that he would "tell the whole story" after he saw his lawyer in Des Moines, and then explained:

> even before making these statements, Williams had effectively asserted his right to counsel by having secured attorneys at both ends of the automobile trip, both of whom, acting as his agents, had made clear to the police that no interrogation was to occur during the journey. Williams knew of that agreement and, particularly in view of his consistent reliance on counsel, there is no basis for concluding that he disavowed it.

*Id.* at 405. Nothing in that language suggests that Williams could not have initiated contact with the police and then validly waived his right to counsel, in spite of his attorney's no-interrogation agreement. That point is made clear by the concurring opinion, debunking the very argument the petitioner makes here:

> The dissenting opinion of the Chief Justice states that the Court's holding today "conclusively presumes a suspect is legally incompetent to change his mind and tell the truth until an attorney is present." I find no justification for this view. On the contrary, the opinion of the Court is explicitly clear that *the right to assistance of counsel may be waived, after it has attached, without notice to or consultation with counsel.* We would have such a case here if petitioner had proved that the police officers refrained from coercion and interrogation, as they had agreed, and that Williams freely on his own initiative had confessed the crime.

*Id.* at 413 (Powell, J., concurring) (emphasis added; citations omitted).

The *Brewer* Court held the illegality of the police actions stemmed from the fact that by speaking to the defendant without counsel present and without a waiver by the defendant, they

-11-

violated the defendant's Sixth Amendment rights. The Court's holding did not depend on any sort of breach of an agreement involving the defendant's attorney. The existence of the agreement only served as further evidence that the defendant did not want to waive his right to counsel. *Brewer* does not clearly establish that once counsel strikes a no-interrogation agreement with the police, a suspect cannot waive his right to counsel.

The petitioner does not point to any other case to support his argument, and the magistrate judge correctly asserted that all existing case law contradicts the petitioner's contention. In particular, in *Moran v. Burbine*, 475 U.S. 412 (1986), the Supreme Court held that "[o]nce it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer . . . the analysis is complete and the waiver is valid as a matter of law." *Id.* at 422-23. The Court noted that "[e]vents occurring outside the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Id.* at 422. Similarly, Grant was unaware of both the agreement that the police would contact Griem upon his arrest and the fact that this agreement had been breached. Yet he *was* aware of his *Miranda* rights, and he knowingly and voluntarily opted to waive them.

The state courts' determination that Grant waived his right to counsel when he asked to speak (and did speak) to Detective Kozlowski reasonably applied federal law. The police in this case did not undergo the "intentional police misconduct . . . that the Court rightly condemns" in *Brewer*. 430 U.S. 387 at 408 (Marshall, J., concurring). The police informed the petitioner that Griem was no longer representing him, as Griem had announced publically. Even if that statement was technically incorrect, there is no reason to think that the police deliberately lied to the petitioner. It was their

understanding that Griem was no longer the petitioner's attorney. *See* Hr'g Tr., Dec. 14, 2007 at 21, 42. The petitioner did not ask to contact Griem himself to verify that information. The police had not "purposely sought during [the petitioner's] isolation from his lawyer[] to obtain as much incriminating information as possible"; in fact, it was Grant himself who initiated contact with the police. *Brewer,* 430 U.S. at 399. The police offered the petitioner a phone book to find another attorney, but the petitioner declined the offer. He very clearly wanted to speak with the police and confess, unlike the defendant in *Brewer* who was tricked into doing so.

The admission of Grant's statement at trial did not offend the Constitution or federal law.

III.

The Court agrees with the magistrate judge's statements of the law and his analysis. The Court concludes that the petitioner is not in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petitioner's objections to the magistrate judge's report and recommendation [dkt #12] are **OVERRULED**.

It is further **ORDERED** that the report and recommendation [dkt #11] is **ADOPTED**.

It is further **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   March 24, 2015

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 24, 2015.

                                        s/Susan Pinkowski
                                        SUSAN PINKOWSKI

-14-